# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * *      *
ELMER GRAHAM, as parent and             *      No. 14-048V
natural guardian of G.G.G.,             *      Special Master Christian J. Moran
a minor child,                          *
                    Petitioner,         *
                                        *      Filed: August 4, 2015
v.                                      *
                                        *      Attorneys' fees and costs;
SECRETARY OF HEALTH                     *      reasonable basis.
AND HUMAN SERVICES,                     *
                                        *
                    Respondent.         *
* * * * * * * * * * * * * * * * * *      *
```

<u>Anne C. Toale</u>, Maglio Christopher and Toale, P.A., Sarasota, FL, for petitioner;

<u>Amy P. Kokot</u>, United States Dep't of Justice, Washington, D.C., for respondent.

## PUBLISHED DECISION DENYING
## <u>MOTION FOR ATTORNEYS' FEES AND COSTS[1]</u>

    Elmer Graham filed a petition for compensation, on behalf of his child, G.G.G., under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10 through 34 (2012). His petition alleged that G.G.G. suffered intractable seizures, limbic encephalopathy, respiratory failure, and death as the result of a flu vaccine that she received on October 15, 2012. He failed to establish that the flu vaccine harmed G.G.G. and was denied compensation.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

Despite being denied compensation, Mr. Graham has filed a motion for an award of attorneys' fees and costs as permitted by the Vaccine Act.  The Secretary has opposed this motion in many respects.  Because Mr. Graham has not established that "reasonable basis" supported his petition, he is not eligible for an award of attorneys' fees and costs.  Therefore, his motion is denied.

### G.G.G.'s Medical History[2]

G.G.G. was born in 2006.  At the age of 6, she received a flu vaccine on October 15, 2012.  Exhibit 1 at 1-3.  In his motion for attorneys' fees, Mr. Graham emphasizes that the vaccine contained a live, attenuated version of the influenza virus.  The tradename for this vaccine is FluMist.

Approximately one month later, G.G.G. started having discomfort when she was urinating and lower back pain.  The doctor diagnosed her with a urinary tract infection and prescribed an antibiotic.  Exhibit 3 at 54-57.[3]

On November 19, 2012, G.G.G. reported that she had achiness, a sore throat, and a fever that began the previous day.  The doctor again diagnosed her as suffering from a urinary tract infection and prescribed a different antibiotic.  Exhibit 3 at 50-53.

On November 21, 2012, G.G.G. went a third time to the urgent care center where she had been seen previously.  Id. at 46.  She complained about having a fever, headache, and achiness throughout her body.  Her temperature was 103.3° F.

---

[2] The parties do not contest the chronology of events at the end of G.G.G.'s life. Compare the petition, filed Jan. 22, 2014, with the Secretary's Rule 4 report, filed May 27, 2014, at 2-7.  Accordingly, this decision sets forth only a summary of the facts.

[3] The materials submitted with the application for attorneys' fees include a statement that Mr. Graham provided to Ms. Toale, dated March 22, 2013.  App. to Pet'r's Mem. at 10.  Mr. Graham asserted that about 10-14 days after the vaccination, G.G.G. "started having random fevers, she began to be less active, and she was having problems concentrating and staying focused on her school work."  Mr. Graham also stated that "about three to [f]our weeks after the vaccine, I noted that late at night while she was sleeping, she was making a sucking or smacking sound with her mouth. I thought that she was grinding her teeth or dreaming, but now I know that she was having seizures."  Id. at 11.  Ms. Toale did not transform the statement into an affidavit and she did not submit Mr. Graham's statement until after the case on the merits ended.

She also had some "spotting" on her face.  The doctors interpreted her complete blood count as consistent with a viral infection.  She was again diagnosed with a urinary tract infection as well as a rash and fever.  Id.

On November 23, 2012, G.G.G. had "seizure-like activity" for which her family called an ambulance.  While traveling to the hospital, paramedics observed several seizures.  Exhibit 5 at 4-5.  In the emergency room, G.G.G. required intubation.  Id. at 7, 10.  Various tests were performed, including a lumbar puncture to test her cerebrospinal fluid (CSF).  The CSF testing was consistent with viral meningitis.  Exhibit 5 at 7, 9, 23; exhibit 11 at 99.

The next day, G.G.G. was transferred to Arkansas Children's Hospital by airlift.  Her diagnoses at discharge from the first hospital were viral meningitis, an allergic reaction to antibiotics, and a seizure.  Exhibit 5 at 11.

G.G.G. remained in Arkansas Children's Hospital from November 24, 2012, until her unfortunate death on December 14, 2012.  Exhibit 11 at 11.  During those three weeks, G.G.G. continued to have seizures despite being placed on multiple anti-seizure medications.  Id.

G.G.G. underwent many tests.  On December 3, 2012, a test indicated that G.G.G. had elevated levels of thyroglobulin and thyroid peroxidase antibodies.  Exhibit 11 at 11, 434.  An endocrinologist stated that G.G.G. could possibly be suffering from Hashimoto's encephalopathy[4] but he was uncertain about this diagnosis.  Exhibit 11 at 259-60.

When G.G.G. died, the diagnosis included intractable seizures, limbic encephalopathy of unknown etiology, and respiratory failure.  Exhibit 3 at 3, 88.  Additional information about G.G.G. was learned in an autopsy, which was performed on December 17, 2012 by Carmen Steigman, M.D.  Exhibit 11 at 10.  In her view, G.G.G.'s brain had nonspecific findings consistent with the findings reported in Hashimoto's encephalopathy.  G.G.G.'s thyroid and other endocrine organs appeared normal.  Dr. Steigman concluded "the patient died of

_____

[4] The medical records are not consistent about including the apostrophe s in "Hashimoto's encephalopathy."  The medical records also appear to use "encephalopathy" and "encephalitis" interchangeably.

Hashimoto['s] encephalopathy, complicated by status epilepticus and respiratory failure." Exhibit 11 at 12.  Dr. Steigman also drafted an addendum that discussed whether G.G.G. died of Hashimoto's encephalitis.  Id. at 18.

On January 4, 2013, Mark Heulitt, M.D., completed the death certificate.  It states that G.G.G. died from respiratory failure as a consequence of status epilepticus.  Exhibit 13 at 1.

### Procedural History[5]

On March 19, 2013, Mr. Graham telephoned Ms. Toale's office and spoke with a paralegal.  Over the next five months, paralegals obtained medical records.[6] In October and November, 2013, Ms. Toale reviewed the medical records that had been collected.  Ms. Toale's paralegal continued to work on the case, although the descriptions are so cursory that it is difficult to understand what the paralegal was doing.

On December 13, 2013, Ms. Toale was summarizing additional medical records.  Over the next few days, Ms. Toale emailed a pathologist regarding causation.  At the end of December 2013, the paralegal was drafting a letter to Douglas C. Miller, M.D., Ph.D.  On January 3, 2014, the paralegal was preparing a "package for expert, Dr. Miller."[7]

_____

[5] Because Mr. Graham asserts that the actions of his attorney, Ms. Toale, support the reasonable basis for his claim, Ms. Toale's activities are described as part of the procedural history of the case.  The basis for Ms. Toale's work is her timesheets that were submitted with the motion for attorneys' fees.

[6] The entries say "review and download medical records."  The lack of description as to what medical records are being reviewed frustrate an assessment of the reasonableness of the activity.  Consequently, Ms. Toale is urged to instruct her staff to include at least the name of the provider of the medical records.

[7] In other cases, attorneys from Ms. Toale's law firm have worked with Dr. Douglas Miller.  See, e.g., Phillips-Deloatch v. Sec'y of Health & Human Servs., No. 09-171V, 2015 WL 1950107, at *3 (Fed. Cl. Spec. Mstr. Apr. 9, 2015).

On January 13, 2014, the paralegal spent 0.3 hours drafting a petition.  On January 16, 2014, Ms. Toale spent 1.5 hours reviewing the records and finalizing the petition for filing.

The clerk's office docketed Mr. Graham's petition on January 22, 2014.[8] The petition recites relevant information from G.G.G.'s medical history, although the petition does not cite to specific exhibit numbers or page numbers.  On February 3, 2014, the clerk's office received a compact disc containing most of the relevant records.

On March 18, 2014, Ms. Toale and her paralegal communicated with Dr. Miller more than once.  The subject of these emails included "slides and autopsy."

On March 28, 2014, respondent filed a status report stating that petitioner's medical records appeared complete.  Respondent filed her Rule 4 report on May 27, 2014, stating that petitioner had not met his burden of proof and was not entitled to compensation.  Resp't's Rep. at 7.

Respondent also argued that "none of G.G.G.'s treating providers suggested a causal relationship between the flu vaccine and either her illness or death."  Id. at 10.  Respondent also noted that G.G.G.'s records indicated two possible alternative causes of her death, including Hashimoto's encephalopathy of an unknown cause and viral encephalitis.  Id. at 11.

On June 6, 2014, Ms. Toale spent 0.2 hours in conference with a pathologist.  On June 9, 2014, Ms. Toale spent 0.2 hours emailing her staff regarding her conference with an expert and spent 0.5 hours reviewing emails with a consultant and preparing for a status conference.

A status conference was held on June 9, 2014, to discuss respondent's Rule 4 report.  Order, issued June 9, 2014.  During this conference, Ms. Toale stated that

---

[8] The Secretary's opposition to the motion for attorneys' fees points out that Ms. Toale submitted the petition well in advance of the deadline for the statute of limitations.  The Vaccine Act establishes a deadline "of 24 months from the date of the death."  42 U.S.C. § 300aa–16(a)(3).

she was awaiting feedback from a pathologist consultant before beginning a search for an expert witness to opine on his case.

A follow-up status conference was held on July 17, 2014, to discuss Mr. Graham's progress pursuing an expert report.  Ms. Toale reported that she expected a report from a pathologist soon and might seek a report from a neurologist.  Order, issued July 17, 2014.

On July 30, 2014, Mr. Graham filed a status report stating that he intended to file a motion to dismiss his case.  Mr. Graham filed his motion to dismiss on August 18, 2014, including a report from Dr. Miller.  In his report, Dr. Miller concludes that, "my review of the case including the slides, which showed that in fact there is an inflammatory process in the thyroid consistent with Hashimoto's Thyroiditis, provides a firmer support for the conclusion that [G.G.G.] in fact did die of complications of Hashimoto's Encephalopathy."  Pet'r's Mem. at 5.

On September 24, 2014, Mr. Graham's case was dismissed.  2014 WL 5448705.  This dismissal concluded the merits aspect of his case.

On April 23, 2015, Mr. Graham filed the pending motion for an award of attorneys' fees and costs.  He requested $23,065.60 in fees and $7,441.37 in attorneys' costs.  Pet'r's Mot. for Att'ys' Fees and Costs at 1.  The motion also represented that Mr. Graham did not incur any costs personally.  Mr. Graham supported his request with a relatively lengthy memorandum of which a significant portion was directed to establishing the reasonableness of the hourly rates for Ms. Toale and other members of her firm.  Pet'r's Mem.  The memorandum, in turn, is supported by an appendix of which approximately 150 pages are devoted to the hourly rates.[9]

The Secretary opposed the motion for attorneys' fees and costs, raising two arguments.  The Secretary primarily contended that "the present petition lacked a reasonable basis when filed, and one was never established."  Resp't's Opp'n at 13.  Secondarily, the Secretary maintained that the amount requested was

---

[9] Ms. Toale has submitted this appendix in other cases in which the hourly rates of the attorneys and paralegals have been disputed.

excessive, but did not make a particular objection to the proposed hourly rate.  The Secretary identified three relatively minor issues.  Id. at 15-16.

Mr. Graham filed a reply.  The first five pages were devoted to reasonable basis.  The next ten pages addressed the amount requested, focusing on the hourly rate for Dr. Miller.  With the submission of the reply, the matter is ready for adjudication.

## Standards for Adjudication

Under the "American rule," each litigant pays for its participation in litigation.  Baker Botts, L.L.P. v. ASARCO, L.L.C., 135 S.Ct. 2158, 2160 (2015).  However, the Vaccine Act (like many other statutes) shifts the responsibility for fees under certain circumstances.  First, when a petitioner in the Vaccine Program receives compensation, the special master "shall" award reasonable attorneys' fees and costs.  42 U.S.C. § 300aa–15(e)(1).  Because Mr. Graham did not receive compensation, an award of attorneys' fees is not mandatory in his case.  Instead, he relies upon a second provision in the Vaccine Act.  When the petitioner does not receive compensation, "the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."  Id.  Thus, non-prevailing petitioners must establish two conditions precedent for being eligible for an award of attorneys' fees:  "good faith" and "reasonable basis."  Here, the Secretary does not question Mr. Graham's good faith belief that the FluMist vaccine harmed G.G.G.  Resp't's Opp'n at 4.  Consequently, the remaining issue is whether "there was a reasonable basis for the claim for which the petition was brought."  42 U.S.C. § 300aa–15(e)(1).

The Federal Circuit has not interpreted this phrase or provided any guidance as to how petitioners satisfy the reasonable basis standard.  Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 285 (2014) (citing Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148 (2012)).  In the absence of guidance, special masters have taken different approaches.  Silva v. Sec'y of Health & Human Servs., No. 10-101V, 2012 WL 2890452, at *8-9 (Fed. Cl. Spec. Mstr. June 22, 2012), mot. for rev. denied, 108 Fed. Cl. 401 (2012).

Recent decisions have examined whether any evidence supports "the claim for which the petition was brought." When some (as yet undefined) quantity and quality of evidence supports the claim for which the petition was brought, then the petitioner satisfies the reasonable basis standard. However, when the only evidence supporting the claim that the vaccine caused an injury is a sequence of events in which the vaccination preceded the injury, then the petitioner does not satisfy the reasonable basis standard. <u>Chuisano v. Sec'y of Health & Human Servs.</u>, No. 07-452V, 2013 WL 6234660, at *14 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), <u>mot. for rev. denied</u>, 116 Fed. Cl. 276, 287 (2014) ("Temporal proximity is necessary, but not sufficient.").[10]

The statute requires "a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1). These are the words that Congress used. But, Mr. Graham has proposed a different test. In his view, the "question is whether, under the totality of circumstances of the instant case, it was reasonable to bring the claim." Pet'r's Mem. at 8. Mr. Graham's shift from "reasonable basis for the claim for which the petition was brought" to reasonable basis "to bring the claim" alters the statute. Although more attorneys would become eligible for attorneys' fees for representing unsuccessful petitioners if the statute required only a showing that filing the petition was reasonable, the statute is not written in those terms. The duty of judicial officers "is limited to interpreting the statute as it was enacted, not as it arguably should have been enacted." <u>Beck v. Sec'y of Health & Human Servs.</u>, 924 F.2d 1029, 1034 (Fed. Cir. 1991). The statute that Congress

---

[10] Although the undersigned special master's decision in <u>Chuisano</u> indicated that petitioners satisfy the reasonable basis standard by submitting "evidence," the Chief Judge in some respects agreed and in some respects disagreed. The Chief Judge agreed with the emphasis on "evidence." The Chief Judge also stated that a more amorphous standard would be appropriate, one that took into account the "totality of the circumstances." <u>Chuisano</u>, 116 Fed. Cl. at 286.

At first blush, the "totality of the circumstances" may seem different from the special master's approach to look at the evidence. However, the issues the Chief Judge identified as part of the totality of the circumstances are, generally speaking, issues resolved by analyzing evidence.

The primary point of departure between the two opinions in <u>Chuisano</u> is whether the actions of the petitioner's attorney are relevant to the reasonable basis inquiry. The attorney's conduct is arguably most relevant when the petitioner contacts the attorney close to the expiration of the time set forth in the statute of limitation. But, this issue is not present here because Mr. Graham communicated with Ms. Toale more than one year before the deadline for filing his petition.

wrote imposes a threshold --- a threshold that is less demanding than the preponderance of the evidence standard, but a threshold nonetheless --- that the evidence must cross for a petitioner to become eligible for attorneys' fees.  See Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury"); Chuisano, 116 Fed. Cl. at 286 ("Fee denials are expected to occur"); McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 305 (2011) ("The burden is on the petitioner to affirmatively demonstrate a reasonable basis"), decision on remand vacated, 2012 WL 1884703 (May 3, 2012).

Moreover, the statute's use of the phrase "reasonable basis for the claim for which the petition was brought" is consistent with other portions of the statute that require the petition to be filed with evidence.  See Chuisano, 2013 WL 6234660, at *8-10. This evidence may include medical records, affidavits from percipient witnesses, and opinions from retained experts.  See 42 U.S.C. § 300aa–11(c).

## Application

Mr. Graham's petition claimed that the FluMist vaccination on October 15, 2012, caused G.G.G.'s seizures and her eventual death.  Pursuant to the explication above, Mr. Graham becomes eligible for attorneys' fees and costs by presenting some evidence in the form of medical records or expert reports that supports this allegation.  Chuisano, 116 Fed. Cl. at 286 ("reasonable basis is a standard that petitioners, at least generally, meet by submitting evidence") (internal quotation marks omitted).

By this standard, the answer to this question is straightforward.  Mr. Graham cited no evidence that the FluMist caused G.G.G.'s seizures and/or her death.  Mr. Graham did not cite to any medical record in which a treating doctor linked the FluMist vaccination to G.G.G.'s seizures.  Mr. Graham also did not file a report from an independently retained expert who opined that the FluMist caused G.G.G.'s seizures and/or her death.  The absence of evidence means that there is no basis (reasonable or otherwise) for the claim set forth in the petition.  Mr. Graham does not satisfy the reasonable basis standard.

Mr. Graham's case closely resembles Chuisano, a case upon which Mr. Graham relied.  See Pet'r's Mem. at 7-8.  In Chuisano, the petitioner alleged that

the flu vaccine caused her mother's death.  The petitioner made this claim despite the lack of support in the medical records.  The treating doctors and death certificate said that the decedent died from a medical condition unrelated to the vaccination, sepsis.  Chuisano, 116 Fed. Cl. at 279-80.  The petitioner's attorney filed the case without an expert report and then, while the case was pending, looked for an expert.  When the attorneys could not find an expert to support their claim, the case was dismissed.

The undersigned special master denied the motion for an award of attorneys' fees and costs because the petitioner did not satisfy the reasonable basis standard.  In particular, the petitioner did not present any evidence that the flu vaccine contributed to her mother's death.  Chuisano, 2013 WL 6234660, at *24.  The Chief Judge denied a motion for review, finding that the decision to deny attorneys' fees was not arbitrary.  Chuisano, 116 Fed. Cl. at 293.  While the Chief Judge's opinion does not constitute binding precedent for Mr. Graham's case, the reasoning that petitioners who advance no supporting evidence for the claim for which their petition is brought lack a reasonable basis persuasively tracks the statute.

As mentioned earlier, Mr. Graham cited the Chief Judge's opinion in Chuisano, but Mr. Graham made no explicit effort to distinguish the outcome in Chuisano from his case.  However, Mr. Graham raises two arguments that were not considered in Chuisano.

Mr. Graham's primary argument for finding reasonable basis is that the treating doctor's diagnosis that G.G.G. suffered from Hashimoto's encephalitis was wrong.  The reasoning seems to be that if G.G.G. did not suffer from Hashimoto's encephalitis, then she suffered from a different form of encephalitis.  In Mr. Graham's view, this different form of encephalitis must be an encephalitis caused by the FluMist vaccine.  See Pet'r's Mem. at 8-10.

Mr. Graham cited some evidence that called into question Hashimoto's encephalitis as the diagnosis.  Id. at 9-10.  A petitioner's ruling out of other potential causes does help a petitioner establish a vaccine caused the injury.  Walther v. Sec'y of Health & Human Servs., 485 F.3d 1146, 1148-49 (Fed. Cir. 2007); but see Caves v. Sec'y of Health & Human Servs., 100 Fed. Cl. 119, 140-41 (2011) (holding that the ruling out of potential alternative causes does not establish that the vaccine can cause a disease), aff'd without op., 463 F. App'x 932 (Fed. Cir. 2012).

10

Yet, the Federal Circuit has stated repeatedly that the ruling out of potential other causes does not entitle a petitioner to compensation.  In an off-Table case, the petitioner bears the burden of presenting evidence that the vaccine caused the injury.  Lombardi v. Sec'y of Health & Human Servs., 656 F.3d 1343, 1350-51 (Fed. Cir. 2011); Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1321-22 (Fed. Cir. 2010).[11]

Here, Mr. Graham has presented no evidence that the FluMist caused G.G.G.'s death.  At best, Mr. Graham argues "the instant case could have proceeded on a theory that vaccine-associated encephalitis was a more likely diagnosis than Hashimoto's."  Pet'r's Mem. at 9.  But, "[t]o establish a reasonable basis, a petitioner must rely on more than speculation."  McKellar, 101 Fed. Cl. at 303.  As recognized in Chuisano, 2013 WL 6234660, at *19, what might have happened does not constitute evidence.

Mr. Graham argues that because FluMist is a vaccine that contains an attenuated version of the live virus, FluMist can cause any problems that the influenza virus can cause.  This proposition does not satisfy the reasonable basis standard.  Technically, Ms. Toale has made this assertion without any evidence.[12]  But, setting aside that technicality, the bigger problem is that Mr. Graham has presented no evidence that this proposition applies to G.G.G.'s case.  Broekelschen v. Sec'y of Health & Human Servs., 618 F.3d 1339, 1352-53 (Fed. Cir. 2010) ("a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case").

Here, two facts in G.G.G.'s history raise obvious questions about the applicability of live attenuated virus theory.  G.G.G.'s first presenting symptoms were problems with urinating and Mr. Graham has presented no evidence that a flu infection causes urination problems.  In addition, the medical records show the

---

[11] It is extremely important to recognize that the Federal Circuit cases talking about petitioner's burden are in the context of petitioner's burden to establish that they are entitled to compensation (not attorneys' fees).  The burden on entitlement is preponderance of the evidence.  However, the burden for "reasonable basis" is something less than preponderant evidence.  Chuisano, 116 Fed. Cl. at 287.

[12] Special masters are generally familiar with this proposition and, as Mr. Graham noted in his reply, the Secretary did not challenge this assertion.

11

latency between G.G.G.'s encounter with the live attenuated flu virus from the FluMist vaccine and her onset of symptoms was approximately one month.  If Mr. Graham wanted to proceed on a theory that the live attenuated virus caused symptoms in G.G.G., he would need to present some evidence that virus would not lead to symptoms in G.G.G. for approximately 30 days.[13]  It might be the case that a doctor could have presented a reliable opinion addressing these obvious questions but Mr. Graham did not produce such a report.

In short, Mr. Graham's case contains many gaps.  These places where Mr. Graham submitted no evidence distinguish his case from numerous other cases in which a petitioner presented some evidence but the evidence was not sufficiently persuasive to carry the petitioner's burden of proof.

Mr. Graham's second argument supporting reasonable basis is not an argument about the evidence supporting Mr. Graham's claim.  It is an argument about gathering evidence.  Pursuant to the Court's order in Chuisano, an attorney's conduct may be part of the "totality of the circumstances" that are used to evaluate whether a reasonable basis supported the claim for which the petition was filed.  Chuisano, 116 Fed. Cl. at 289.  In accord with the Chief Judge's order, Mr. Graham's non-evidence based argument will be considered.

Mr. Graham initially argued that "in death cases, petitions are filed as soon as possible in order to prevent spoliation of critical evidence."  Pet'r's Mem. at 11.  In reply, he expanded on this argument.  Mr. Graham's attorney, Ms. Toale, stated:

> In every death case, the ability of a Petitioner to prove his case depends completely on the ability to obtain the remains of the decedent from the medical examiner's office and have those analyzed by an expert of his own choosing.  In the experience of the undersigned, it is not a quick and easy process to get the autopsy products from medical examiners and there is always a clock running in

---

[13] In support of the application for attorneys' fees, Ms. Toale submitted Mr. Graham's statement that suggested G.G.G. was having seizures 10-14 days after vaccination.  This statement appears to be necessary because otherwise the "time lag [in the medical records] might suggest an onset issue."  Pet'r's Mem. at 1 n.2.  The ostensible problem in timing was another reason Ms. Toale should have paused before filing the petition.

order to obtain that evidence before it is destroyed,
degrades or is lost. Every medical examiner's office has
its own policies about releasing autopsy products and
each state has different laws regarding retention of such
evidence. . . . Quite often, medical examiners' offices
will not release autopsy products without a subpoena and
that requires filing an action first.

Moreover, in pediatric death cases, there are often
additional records of import to the case such as police,
fire, EMS, 911 and child protective services. Due to the
sensitive nature of the death of a child, these records are
ordinarily also not available without a subpoena. . . . In
summary, death cases present a unique situation where an
attorney's professional responsibilities require that the
attorney take all reasonable measures to preserve the only
evidence that exist to investigate a death claim, and that
means filing suit as soon as practicable.

Pet'r's Reply, filed May 22, 2015, at 5.

If the facts and circumstances actually corresponded to this argument, it
might be a persuasive reason to overlook the lack of evidence supporting the claim
that the FluMist vaccine caused G.G.G.'s seizure and death. Like the question
about whether a looming statute of limitations affects the reasonable basis analysis,
whether the obligation to present evidence to support reasonable basis should be
suspended in a case in which the attorney filed a case to gather otherwise
unavailable evidence is difficult.

However, Mr. Graham's case does not present this challenging question.
Ms. Toale did not request the authority to issue a subpoena. It appears that her
office possessed all the documents relating to G.G.G.'s case when Ms. Toale filed
the petition. While paralegals communicated with the hospital where G.G.G.'s
autopsy was performed, none of the entries mention that the reason for the
communication was the autopsy. The paralegals' entries are too cryptic and too
cursory to conclude that the hospital resisted providing access to autopsy materials.
And, even if the hospital did not turn over autopsy materials immediately, the
hospital did give material to Dr. Miller eventually. Again, the hospital made this
material available without Ms. Toale using a subpoena.

13

As the Secretary argued, Ms. Toale "could have completed her entire review of this case <u>and</u> obtained Dr. Miller's finalized report before the statute of limitations would have run." Resp't's Opp'n at 14. Ms. Toale's filing of the petition did not promote the investigation of the claim. She could have conducted the exact steps before she filed the lawsuit. For example, Ms. Toale was apparently consulting Dr. Miller in December 2013, the month before she submitted the petition on Mr. Graham's behalf. If Ms. Toale had investigated the claim and gotten a response from Dr. Miller before filing the petition, she would have reached the same conclusion that she did after the case was filed --- there was no evidence to support the claim that the FluMist vaccine caused G.G.G.'s death.

For these reasons, Mr. Graham has not established "a reasonable basis for the claim for which the petition was brought." This showing is a condition for an award of attorneys' fees and costs to a non-prevailing party. Without this showing, Mr. Graham is not eligible for an award of attorneys' fees and costs.[14]

## Conclusion

Mr. Graham's motion for attorneys' fees is costs is DENIED.

**IT IS SO ORDERED.**

<u>s/ Christian J. Moran</u>
Christian J. Moran
Special Master

---

[14] Given this outcome, there is no reason to determine whether the requested amount of attorneys' fees and costs is reasonable.